UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

TOMMY JOE OWENS, )
)
Petitioner, )
)
v. ) No.:  3:14-cv-529-TAV-HBG
)
GERALD McALLISTER, Warden, )
)
Respondent. )

## MEMORANDUM AND ORDER

Tommy Joe Owens ("Petitioner"), an inmate confined in Northeast Correctional Complex in Mountain City, Tennessee, brings this petition for a writ of habeas corpus, 28 U.S.C. § 2254, challenging the legality of his confinement under a judgment of the Criminal Court for Campbell County, Tennessee [Doc. 1].  Warden Gerald McAllister ("Respondent") filed a response in opposition to the petition, supported by copies of the state-court record [Doc. 7].  Petitioner has failed to reply to Respondent's response, and the time for doing so has passed.  E.D. Tenn. L.R. 7.1.  For the following reasons, Petitioner's § 2254 motion will be **DENIED**.

## I.    PROCEDURAL HISTORY

A Campbell County Criminal Court jury convicted Petitioner of three counts of aggravated child abuse and one count of aggravated child neglect.  Petitioner was sentenced to twenty-five years for each aggravated child abuse conviction and twenty years for the aggravated child neglect conviction, with the sentences to run consecutively for an effective sentence of ninety-five years.  *State v. Tommy Joe Ownes*, No. E2007-02296-CCA-R3-CD, 2009 WL 4931340 (Tenn. Crim. App. Dec. 22, 2009), *perm. app. denied* (Tenn. May 11, 2010).  On direct appeal of his convictions, Petitioner argued, in relevant part that (1) the evidence was insufficient

to support his aggravated child abuse convictions, (2) his trial was rendered fundamentally unfair by the loss of taped interviews of the children made by the Department of Children's Services ("DCS"), (3) the trial court improperly restricted courtroom testimony, and (4) consecutive sentencing was improper. *Id.* The Tennessee Court of Criminal Appeals ("TCCA") reversed one of Petitioner's convictions for aggravated child abuse, affirmed the other convictions, and found that Petitioner's sentences must run concurrently, not consecutively, therefore reducing Petitioner's effective sentence to twenty-five years. *Id.* at 32, 91-92. The Tennessee Supreme Court declined any further review. *Id.* at 1.

Petitioner's subsequent application for post-conviction relief was denied by the Tennessee Criminal Court of Appeals. *Owens v. State*, No. E2013-01134-CCA-R3-PC, 2014 WL 1759099, at 11 (Tenn. Crim. App. Apr. 30, 2014). Thereafter, the Tennessee Supreme Court declined any further review. *Id.*

## II. BACKGROUND

The following factual recitation is taken from the TCCA's summary of the evidence presented at trial.[1]

> On June 14, 2004, the victim, H.S. was recovered by police officers from a private home and brought for treatment to the East Tennessee Children's Hospital. The doctors treated the child for multiple injuries including a cauliflower ear, a broken nose that had healed incorrectly, and eyes matted shut from a chemical burn. Appellant, Tommy Joe Owens, is the father of the victim.
>
> *****
>
> Appellant testified on his own behalf at trial. He stated that at the time he was arrested, he lived with Ms. Claiborne, the victim, his other daughter, K.O., and Ms. Claiborne's daughter, A.L. He got custody of H.S. right before Christmas of 2003. He and Ms. Claiborne had been living together about two years by that time. Appellant had been working as an underground miner for nine or ten years at the time of his arrest. Appellant testified that after he got custody of the victim,

---

[1] The TCCA's summary is extremely detailed and lengthy. The Court has, therefore, included only the facts that are relevant to the claims Petitioner has raised in his habeas petition.

his relationship with Ms. Claiborne went "downhill." Ms. Claiborne and the two girls became jealous of the attention he was showing H.S. Things became noticeably worse in April of 2004. Around that time, the family went on a trip to Gatlinburg. Appellant had ample opportunity to observe the victim and did not notice any injuries to her head. On cross-examination, Appellant admitted that the date of the Gatlinburg trip would have actually been in February.

Appellant and Ms. Claiborne began using methamphetamine on the weekends in May. By the end of the month, he and she were using it every day. Appellant admitted that "[methamphetamine] clouded my judgment, I mean, as far as just paying attention and stuff."

*****

Appellant testified concerning what an average day was like in May of 2004. He stated that getting up at 11:30 a.m. would be an early day for him. When he got up, he would start trying to obtain methamphetamine. He would then return home, gather his belongings and go to work for his shift beginning at 3:00 p.m. His shift ended at 11:00 p.m., and Appellant would return home. Appellant worked Monday through Friday and occasionally on Saturday. Appellant was usually home on the weekends. The methamphetamine use did not affect his work. Ms. Claiborne and the older children would be up when he arrived home, but H.S. would be in her bed. H.S. would also be in bed when he got up in the morning. He did not go into her room to see her because of the jealousy exhibited by Ms. Claiborne, K.O., and A.L. On cross-examination, Appellant testified that on the weekends he would not wake up until 11:00 a.m., and H.S. was always asleep when he was awake.

Appellant did notice an injury to the victim's ear at the beginning or middle of May. He asked Ms. Claiborne what had happened. She told him that K.O. had been pushing H.S. on the bicycle and there was an accident. Appellant said he told Ms. Claiborne to take H.S. to the doctor. She told Appellant she would handle the situation. Appellant testified that taking care of the children was the duty of the woman of a household. He stated that he never gave H.S. a bath. Appellant also stated that he had noticed the victim's "hair problem" at the end of April. Ms. Claiborne told him that it was psoriasis and that she was taking care of it. Appellant never treated H.S. He relied upon Ms. Claiborne. Besides the victim's ear and hair, Appellant could not believe what he saw in the photographs taken at the hospital. He denied inflicting any of the victim's injuries. On cross-examination, Appellant stated that he relied upon Ms. Claiborne for the care of H.S. and getting medical attention for the injury he saw to her ear and the hair loss he noticed. He admitted that he did not take it upon himself to check her injuries or take H.S. to the doctor himself.

3

When Appellant was arrested on June 16, 2004, he had been asleep. Ms. Claiborne woke him up to tell him the police were there. He did not see the children in the house when he was walking through the house. He was arrested for having a dog running at large. He was in jail for around an hour and a half. Ms. Claiborne was also arrested. When he returned to the house, there was a note saying that the children were at Ms. Draughn's. He stopped by Ms. Draughn's to tell her he was going to work and ask her to watch the children. After work he returned to get the children. Ms. Draughn told him she was getting ready to feed the children, so he could go home to fix his septic tank. He left but did not see H.S. before he left. Later that day, Appellant's mother came to his house to tell him that Ms. Draughn had called and said that the police had taken H.S. His mother told him that Ms. Draughn had mentioned child abuse. Appellant went to get K.O. While they were driving to the Sheriff's Department, a police officer drove up behind Appellant and activated his blue lights. K.O. began crying and saying that Appellant was going to go to jail because H.S. was hurt.

*****

Annette Owens is Appellant's mother and lived across the street from Appellant and Ms. Claiborne. When Appellant got custody of H.S., Mrs. Owens saw her almost daily. In April of 2004, Mrs. Owens had a discussion with Appellant about Ms. Claiborne's care of the children and the fact that Mrs. Owens was concerned. Appellant told her that he would take care of it. From that point on, H.S. was never in her house up to the time Appellant was arrested. On the day that Appellant was arrested, Mrs. Owens paid the fine to get him out of jail the first time when he was arrested for the dog charges. She offered to get the children from Ms. Draughn's house, but Appellant said that he would take care of it. Mrs. Owens later saw that Appellant was home around 10:00 p.m. Ms. Draughn called after that and told Mrs. Owens that "they took [H.S.]" and that K.O. and A.L. had taken off running. Mrs. Owens went to tell Appellant, and he left to find out what was happening. Mrs. Owens waited and decided to drive towards Ms. Draughn's house. She passed Appellant on the way there. They stopped and spoke. He told her that he had K.O. The police officers arrived at that time and arrested Appellant. Mrs. Owens asked the officers if she could take K.O. with her. They said she could, but she had to bring K.O. to the police station. The officers told Mrs. Owens about the extent of the victim's injuries.

On cross-examination, Mrs. Owens stated that she was a nurse. Appellant never asked her to look at any injuries on the victim's body. She admitted that she blamed Ms. Claiborne for the type of life they were living, but Appellant took responsibility for H.S., and "he should have been the father. . ."

Donnie Owens is Appellant's father. He lived with Mrs. Owens across the street from Appellant. Mr. Owens also worked with Appellant at the coal mine as the production foreman, who was the "boss." He testified that there was a discussion

4

between Appellant and Mrs. Owens in April and after that time he barely saw H.S. or K.O. On the day Appellant was arrested, Mr. Owens saw the police across the street. He walked over and asked what was happening. After he was told, he asked Ms. Claiborne where H.S. and K.O. were. She told him that they were with her mother and shook her head at him. The officers then asked if there were minors in the house. They searched the house and did not find any children. The officers left with Appellant and Ms. Claiborne to take them to jail. Mr. Owens went to see his wife to get a check so he could bail out Appellant. He got Appellant out of jail and took him home. Mr. Owens went to work at the mine. He heard that Appellant also went to work. The mines were not operating that day, so Appellant left to go get Ms. Claiborne out of jail. While Mr. Owens was at work, Mrs. Owens called him to tell him about H.S. being taken and Appellant's arrest because of H.S.'s condition.

K.O. is Appellant's daughter. She testified at trial on behalf of Appellant. At the time Appellant was arrested, she was nine years old. K.O. lived in the house with Appellant, Ms. Claiborne, and the other children. H.S. stayed in a bedroom by herself. K.O. testified that H.S. injured her ear in a bicycle wreck. According to K.O., she was holding onto the bicycle and let her go. H.S. ran into the side of the house on the bicycle when K.O. let go. H.S. hit her head when she fell. K.O. testified that a day or two after the bicycle wreck, Appellant asked what had happened to H.S.'s ear. K.O. also testified that the burns on the victim's bottom were the result of K.O. and A.L. putting her in the bathtub when the water was too hot. The cigarette burns on the victim were inflicted by K.O., A.L., and Ms. Claiborne. K.O. testified that the injuries to the victim's eyes occurred when she and A.L. were swinging H.S. and H.S. hit a table with her face. She did not tell Appellant because she was afraid that she would get into trouble. Ms. Claiborne was keeping K.O. out of school and having her shoplift. K.O. thought that it was a good situation.

K.O. also testified that they tried to hide the victim from Appellant. When the police officers came to arrest Appellant and Ms. Claiborne, K.O., A.L., and H.S. hid from the officers. Appellant was asleep when they left the house. After the officers left, K.O., A.L., and H.S. called Ms. Draughn. Ms. Smith came to pick them up. When they arrived at Ms. Draughn's house, A.L. took the victim to a bedroom and put her in the bed. They covered her up because they were afraid that someone would see H.S. Ms. Draughn knew there was something wrong with the victim. K.O. spoke with Appellant when he came to Ms. Draughn's house, but no one told him about the victim's injuries. When officers arrived later that night, K.O. and A.L. ran because they thought they would be in trouble because of the victim's injuries. K.O. saw Appellant driving down the road and got into the car. She told Appellant that the officers had taken the victim from Ms. Draughn's house. She did not tell Appellant that H.S. had gotten bee stings on her eyes. She told Appellant that the officers had taken H.S. because they thought she had been

5

abused. Appellant was not around the house very much when the victim was injured. He was at work.

On cross-examination, K.O. testified that she spoke with Dr. Diana McCoy about five times in an effort to help her father at trial. When she first met with Dr. McCoy, K.O. told her the same things that she told DCS during her interviews with them, such as, K.O. would sneak H.S. to the bathroom, H.S. would never come out of her room, and someone told her to tell the authorities that H.S. had been stung by a bee. K.O. also told DCS that the children hid when the police came because they did not want to be taken away. She was afraid that they would be taken away because the victim's eyes were already matted shut when the officers came to arrest Appellant and Ms. Claiborne. K.O. was not sure how many days the victim's eyes had been matted shut. She had been with her mother the week before. K.O. returned on Sunday. H.S.'s eyes were not matted shut on Sunday but were on Monday. That same Monday, Appellant, Ms. Claiborne, K.O., A.L., and H.S. went to see about having A.L.'s tongue pierced. They all went in the car together. K.O. stayed in the car with H.S. because of the victim's injuries. According to K.O., Ms. Claiborne told her to stay in the car with H.S.

K.O. and the other children did not go to school the last two weeks of the school year. Ms. Claiborne decided they did not need to go. Appellant did not attempt to take K.O. to school during that time. With regard to the cigarette burns, K.O. testified that she, A.L., and Ms. Claiborne inflicted them. She said they burned the victim's arms and legs. However, when asked if the leg burns were above or below the knee, she replied that she was "not sure." She also could not tell counsel how many cigarette burns they inflicted. When testifying about the water burns from the bath, K.O. said that she and A.L. put H.S. in the water and gave her a bath. She said that the burns inflicted from the bath were to her back and one foot. K.O. repeated that H.S. hurt her eyes from K.O. and A.L. swinging her into the table. She stated that it occurred shortly before Appellant was arrested. With regard to the bicycle wreck, K.O. testified that H.S. rode a "three-wheeler." K.O. said that H.S. could not ride it by herself. K.O. then said that she was not sure if the bicycle was a three-wheeler or a two-wheeler. K.O. stated that H.S. ran into the back of the house. The victim's ear did not sustain a cut, and it did not bleed. It began to swell and looked even bigger the next day. Appellant saw the ear and wanted to take her to the hospital. Ms. Claiborne told him that she had already taken H.S. to the hospital. K.O. stated that H.S. stayed in her room on Ms. Claiborne's instruction.

Dr. Diana McCoy is a clinical psychologist who evaluated Appellant. She testified as an expert witness on Appellant's behalf. To complete her evaluation of Appellant, Dr. McCoy received 4500 pages of records from the State, got his work records, and conducted interviews with Appellant and family members. She also received psychological evaluation records of A.L. After completing her evaluation, Dr. McCoy prepared a nineteen page report. She gave Appellant an

I.Q. test and found him to be of average intelligence. She gave Appellant some additional psychological tests. Her conclusions as to Appellant's mental condition in May or June of the year in question are as follows:

> [Appellant] was experiencing a lot of stress in his relationship with Charlotte Claiborne and was being avoided in the household [by Ms. Claiborne, K.O. and A.L.], was staying away from home as much as he could, was having little contact with Charlotte and with the other-the two girls in the home because he felt himself to be ostracized and that they were angry with him.

*Owens*, 2014 WL 4931340, at *1 (footnotes omitted).

On appeal, Petitioner contended that he received ineffective assistance of counsel.

*Owens*, 2014 WL 1759099, at *1. The following is a summary of findings of the post-conviction court following the evidentiary hearing.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely petition for post-conviction relief, raising numerous issues, including that he received the ineffective assistance of trial counsel because counsel (1) misunderstood the rules of joinder, which resulted in his case being improperly joined with Draughn's case and the jury's hearing about her guilty plea; (2) failed to request a missing evidence jury instruction when the State lost the DCS tapes; (3) failed to make an offer of proof regarding Dr. McCoy's restricted testimony; and (4) incorrectly advised the Petitioner to waive ex post facto protections and be sentenced pursuant to the 2005 amendments to the Tennessee Sentencing Reform Act of 1989.

At the evidentiary hearing, the Petitioner testified that trial counsel was retained. He said that at the time of the offenses, his state of mind was "bad" due to his use of methamphetamine and marijuana. The Petitioner was supposed to go to trial with Teresa Draughn, the victim's baby-sitter, but Draughn pled guilty in front of the jury. The Petitioner said that tape-recorded evidence was missing and that he did not remember if counsel asked the trial court for a missing evidence instruction. Dr. Diana McCoy interviewed the Petitioner several times. The Petitioner said that she also interviewed other witnesses, including K.O. and the daughter "of the girl [he] was living with." However, the trial court limited Dr. McCoy's testimony by ruling that she could not testify about her interviews with those witnesses, and the Petitioner did not remember if counsel made an offer of proof regarding her excluded testimony. He said Dr. McCoy's testimony would have helped his case because she would have testified that he was innocent and "didn't know what was going on."

The Petitioner testified that trial counsel asked him to sign a waiver at sentencing. The Petitioner said that he asked counsel if the waiver was going to "hurt" him and that counsel told him, "[N]o, this has nothing to do with you.... [T]his has no bearing on you whatsoever." The Petitioner said that signing the waiver "got [him] more time." He thought that if he had not signed the waiver, his maximum sentence would have been twenty-one years.

On cross-examination, the Petitioner acknowledged that trial counsel was appointed to represent him in juvenile court when DCS began removing the children from his home. Subsequently, the Petitioner's parents hired trial counsel to represent him in the instant case. During a joinder hearing, Draughn's case was joined with the Petitioner's and Claiborne's case. However, during a severance hearing, the trial court severed the counts involving the victim from the counts involving the other children. The Petitioner acknowledged that during another hearing, trial counsel argued that the defense needed the missing DCS tapes and that the trial court should dismiss the case. The Petitioner also acknowledged that although Dr. McCoy was prohibited from testifying about her interviews with the children, defense counsel called K.O. as a witness for the Petitioner at trial. K.O. tried to testify about what she told Dr. McCoy. Regarding the Petitioner's claim that he could have received no more than twenty-one years if he had not signed the ex post facto waiver, the Petitioner explained, "Well, I'm just assuming that was the max before I signed the waiver that they could have give me before I signed the waiver. Then after I signed the waiver, my understanding, it give me— I agreed to more time." The Petitioner said that the State had offered him a "deal of fifteen years" but that trial counsel told him the maximum sentence he could receive if he went to trial was twenty years. The Petitioner stated, "That's the reason why I took it—one of the reasons I took it to trial because I thought, you know, it was worth five years to try to clear my name" The Petitioner said that he did not understand the waiver when he signed it and that "I still ain't a hundred percent sure what that waiver was. The only thing I know is I agreed to more time."

The Petitioner's trial counsel testified for the State that he had been practicing law for thirty-eight years. At the time of the Petitioner's trial in February 2005, ten to fifteen percent of counsel's practice involved criminal law. Counsel had worked in the district attorney's office for four years and had tried about twenty-five homicide cases. Counsel said he was appointed to represent the Petitioner in juvenile court when DCS began the process to terminate the Petitioner's parental rights. Another attorney was appointed to represent Charlotte Claiborne. Trial counsel developed a relationship with the Petitioner, so the Petitioner's family hired counsel to represent the Petitioner in the criminal case.

Trial counsel testified that during the Petitioner's juvenile court case, he cross-examined the emergency room physician who had examined the victim and heard extensive evidence from witnesses. Counsel met with the Petitioner, and they

talked about the case and trial strategy. Counsel said the Petitioner was very truthful and "never at any time ever laid a hand on this child whatsoever." He said that the Petitioner had a "disconnect" from Claiborne and the children and that the case against the Petitioner was based on criminal responsibility. The defense's strategy was that people hid the victim's condition from the Petitioner.

Trial counsel acknowledged that he opposed joining Draughn's case with the Petitioner's case. Regarding the missing DCS tapes, the tapes had been delivered to the sheriff's office, but office employees lost the tapes. According to a DCS case worker's report, the children had said on the tapes that nobody did anything to the victim, which was exculpatory to the Petitioner. Counsel filed a motion to dismiss the Petitioner's case based on a *Brady* violation, but the trial court denied the motion. Counsel said that he had conversations with two of the children in his office but that none of the conversations "were particularly enlightening as to the content of the tapes." Counsel said he did not request a missing evidence jury instruction because he "didn't think it required calling attention to it. . . It was a judgment call. I chose not to make-ask for an instruction on it, good or bad." He raised the issue of the missing tapes on direct appeal.

Counsel acknowledged that on the morning of trial, in the presence of the potential jurors but before the jury was impaneled, Draughn's attorney announced that she would not be proceeding to trial. Counsel said that he did not object to the announcement because "it was done extemporaneously by the Judge in asking the attorney if [Draughn] was going to plead to something and then the statement came out." He said that he also did not want to call attention to her guilty plea and that "sometimes you just let those things pass on by." Counsel said Draughn's failure to report the abuse actually helped the defense in that it "support[ed] the idea that my client was saying this was hidden from him, not only hidden from him by [Claiborne], the co-defendant, but by others." In fact, counsel introduced Claiborne's guilty plea forms into evidence at the Petitioner's trial as part of the defense's strategy to show that the Petitioner was "disassociated" and that Claiborne was "doing these acts."

Trial counsel testified that Dr. McCoy "gave fairly extensive testimony" at trial, and he acknowledged that the trial court allowed her to give her opinion about the Petitioner's mental state. However, the trial court did not allow her to testify about information she received from other witnesses, such as K.O. Some of those witnesses, including K.O., testified at trial. Dr. McCoy's report about the Petitioner was introduced into evidence at trial for identification purposes only.

Trial counsel acknowledged that the Petitioner signed a written ex post facto waiver at sentencing and said that "we had a meeting before agreeing to it." Claiborne had received an effective fifteen-year sentence in return for her pleas. Counsel said that the Petitioner's signing the waiver "was an opportunity to argue that the threshold of the sentence should be 15 years and that he wasn't as

culpable as the person that the State and the Court accepted a plea on of 15 years, and I thought it would strengthen our argument for that." Counsel denied telling the Petitioner that the waiver "was not about him." Counsel stated, "I wouldn't have said it isn't about him. It's precisely about him. He executes the waiver." Before trial, trial counsel advised the Petitioner that the trial court could sentence him to more than fifteen years if the jury convicted him. Counsel never told the Petitioner that his maximum potential sentence was twenty-one years.

On cross-examination, trial counsel acknowledged that at the joinder hearing, he argued that in order for permissive joinder to apply, a conspiracy had to exist between the Petitioner and Draughn. He also acknowledged that he did not address any other arguments against permissive joinder, stating, "We tried to attack something that [was] more difficult to establish." Counsel did not ask for the missing evidence jury instruction because the trial court could not determine whether the missing DCS tapes had any evidentiary value. Regardless, counsel did not think his failing to ask for the instruction affected the outcome of the trial. Regarding his failure to object to the announcement of Draughn's plea, counsel maintained that the announcement helped the Petitioner's theory of defense. Regarding the trial court's limitation of Dr. McCoy's testimony, counsel testified that Dr. McCoy "testified to substantially what was in her report." As to the Petitioner's signing the ex post facto waiver, counsel said that "I think it's presumptuous to assume the judge [was] going to find [enhancement factors applicable to the sentences]." Counsel said he and the Petitioner discussed "generally the terms of what could be found under enhancement" and the fact that Claiborne's sentence "would work in his favor to get the sentence at the lower end, not on the upper end."

In a written order, the post-conviction court denied the petition for post-conviction relief. Regarding the Petitioner's claim that counsel was ineffective because he misunderstood the rules of joinder, which ultimately resulted in the jury's hearing about Draughn's guilty plea, the trial court ruled that the Petitioner was not entitled to relief because counsel's decisions were based on trial strategy. Regarding counsel's failure to request a missing evidence jury instruction or make an offer of proof for Dr. McCoy's excluded testimony, the post-conviction court ruled that the Petitioner was not entitled to relief because this court addressed those issues on direct appeal and found no error or harm. Finally, regarding the Petitioner's claim that the trial counsel incorrectly advised him about the ex post facto waiver at sentencing, the trial court ruled that signing the waiver "placed the Petitioner in an essentially more favorable position" and that, in any event, the Petitioner would have received the same sentence even if he had not signed the waiver.

*Owens*, 2014 WL 1759099, at *5 (footnotes omitted).

10

### III.    STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified in 28 U.S.C. § 2241, *et seq.*, a court considering a habeas claim must defer to any decision by a state court concerning the claim unless the state court's judgment: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding.  28 U.S.C. § 2254(d)(1)-(2).

A state court's decision is "contrary to" federal law when it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or resolves a case differently on a set of facts which cannot be distinguished materially from those upon which the precedent was decided. *Williams v. Taylor*, 529 U.S. 362, 413 (2000).   Under the "unreasonable application" prong of § 2254(d)(1), the relevant inquiry is whether the state-court decision identifies the legal rule in the Supreme Court cases which govern the issue, but unreasonably applies the principle to the particular facts of the case.   *Id*. at 407.   The habeas court is to determine only whether the state court's decision is objectively reasonable, not whether, in the habeas court's view, it is incorrect or wrong.  *Id*. at 411.

The § 2254(d) standard is a high standard to satisfy.   *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (noting that "§ 2254(d), as amended by AEDPA, is a purposefully demanding standard . . . 'because it was meant to be'" (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011))).   Further, findings of fact which are sustained by the record are entitled to a presumption of correctness–a presumption that may be rebutted only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

IV.    ANALYSIS

Petitioner's § 2254 petition raises six main grounds for relief: (1) his conviction was based on the use of a coerced confession; (2) his conviction was based on the use of evidence gained pursuant to an unconstitutional search and seizure; (3) his conviction was based on a violation of the privilege against self-incrimination; (4) his conviction was based on the action of a grand jury or petit jury that was unconstitutionally selected and impaneled; (5) he received ineffective assistance from his trial counsel; and (6) illegal evidence [Doc. 1].

In his answer, Respondent argues that all six of Petitioner's claims should be dismissed. Respondent argues that "[a]ll but Claim 5 are procedurally defaulted and barred from review" [Doc. 7 p. 30].   Respondent states that Claim 2 is a Fourth Amendment claim that is not cognizable on habeas review, and Claims 1, 2, 3, and 6 should be dismissed as insufficiently pled [*Id*.].   Respondent further argues that the state court's rejection of the ineffective assistance sub-claims of Claim 5 was not contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of fact in light of the evidence before the state court [*Id*. at 31].

The Court agrees with Respondent concerning the appropriateness of habeas relief and, for the reasons that follow, will **DENY** the petition and **DISMISS** this case.

A.    **Procedurally Defaulted Claims**

As previously stated, Respondent argues that Claims 1, 2, 3, 4, and 6 are procedurally defaulted and barred from review. The Court agrees for the following reasons.

12

### 1. Procedural Default

Under 28 U.S.C. § 2254(b), a federal court's jurisdiction to hear a habeas claim is limited to those cases in which the petitioner has exhausted all available state-court remedies. The statute provides that:

> (1)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that–
>> (A)     the applicant has exhausted the remedies available in the courts of the State; or
>> (B)     (i)     there is an absence of available State corrective processes; or
>>
>> (ii)     circumstances exist that render such process ineffective to protect the rights of the applicant.
>
> (2)     An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

28 U.S.C. § 2254(b); *see also Granberry v. Greer*, 481 U.S. 129, 133–34 (1987); *Rose v. Lundy*, 455 U.S. 519 (1982).

A petitioner must present each factual claim to the state court as a matter of federal law. *See Gray v. Netherland*, 518 U.S. 152, 163 (1996) ("It is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the substance of such a claim to a state court"). In essence, a claim sought to be vindicated in a federal habeas proceeding must have been raised in the state courts so that the state courts have the first opportunity to hear the claim. "Where a petitioner has not fully and fairly presented a federal claim to the state's highest court . . . , a federal court will not consider the merits of that claim unless petitioner can show cause to excuse his failure to present the claims appropriately in state court, and actual prejudice as a result." *Stanford v. Parker*, 266 F.3d 442, 451 (6th Cir. 2001) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Cause for a procedural default depends on some "objective factor

external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. *Coleman*, 501 U.S. at 753 (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).

### a. Coerced Confession

Petitioner asserts that his conviction was based on the use of a coerced confession [Doc. 1, 2].

Respondent argues that Petitioner does not brief this claim or otherwise elaborate, he does not identify the statement or testimony he is referring to, and he does not identify any way in which he was coerced into making any statement [Doc. 7 p. 31]. Respondent avers that these pleading deficiencies are an appropriate ground for its dismissal [*Id.*]. Moreover, Respondent argues that this claim is procedurally defaulted and barred from review because Petitioner did not raise the claim on direct appeal [*Id.*]. Respondent maintains that although Petitioner did raise the claim in his initial petition for post-conviction relief, he did not present it on post-conviction appeal to the TCCA [*Id.*]. Respondent argues that because Petitioner did not give the Court of Criminal Appeals the opportunity to consider the claim, he has not exhausted it [*Id.*]. As a result, Respondent argues that it is not barred from presentation to the state courts by the statute of limitations under Tenn. Code Ann. § 40-30-102(a) and the "one petition" limitation of § 40-30-102(c), and it is procedurally defaulted in this proceeding [*Id.*].

A state prisoner must exhaust all constitutional claims by fully and fairly presenting them in state court before a federal court can consider them in a habeas proceeding. 28 U.S.C. § 2254(b)(1)(A), (C). Petitioner's failure to present his claim of coerced confession to the TCCA has resulted in a procedural default of the claim. *See Stanford*, 266 F.3d at 451.

Moreover, the Court finds that even without the procedural default, it is precluded from understanding and addressing the merits of this claim due to the lack of specific pleadings

14

addressing the issue. Petitioner has not alleged any grounds upon which the Court can find cause or prejudice to excuse this procedural default.

Accordingly, Petitioner's claim that his conviction was based on coerced confession will be **DISMISSED** as procedurally barred from habeas review.

### b.        Illegal Search and Seizure

Petitioner asserts that his Fourth Amendment rights were violated because his conviction was based on use of evidence gained pursuant to an unconstitutional search and seizure [Doc. 1].

Respondent argues that this claim is insufficiently pled, it is not cognizable, and it is procedurally defaulted and barred from review [Doc. 7 p. 33]. Specifically, Respondent argues that this claim is subject to dismissal because a Fourth Amendment search and seizure claim, which Petitioner had the opportunity to litigate in state court, does not raise a basis for federal habeas relief [Doc. 33]. The Court agrees.

The Supreme Court has clearly established that "where the [s]tate has provided an opportunity for a full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). As stated in Respondent's answer, Petitioner did not move in the trial court to suppress evidence based on the Fourth Amendment, and Petitioner has not asserted or provided any evidence that he was barred by any state procedural mechanism from bringing such a motion to suppress [Doc. 7 p. 34]. Therefore, Petitioner's claim does not present a cognizable basis for review, and relief is precluded by 28 U.S.C. § 2254(a) because Petitioner received a full and fair opportunity to litigate this claim.

As such, the Court finds that Petitioner is not entitled to relief on his claim of an illegal search and seizure because it does not raise an assertion that is cognizable on habeas relief and, therefore, will be **DISMISSED**.  Based on the Court's finding that this claim is non-cognizable, the Court will not address Respondent's additional arguments regarding insufficient pleading or procedurally defaulted claims.

### c.       Violation of the Privilege Against Self-Incrimination

Petitioner asserts that his conviction was based on a violation of the privilege against self-incrimination [Doc. 1].

Respondent argues that Petitioner does not brief this claim or otherwise elaborate, he does not specify the testimony to which he is referring, and he does not specify in what way it represents a violation of the privilege against self-incrimination [Doc. 7 p. 35].  Respondent avers that these pleading deficiencies are an appropriate ground for its dismissal [*Id.*].  Moreover, Respondent argues that this claim is procedurally defaulted and barred from review because Petitioner did not raise the claim on direct appeal [*Id.*].  Respondent states that "while [Petitioner] did raise it in his initial petition for post-conviction relief, he did not present it on post-conviction appeal to the Tennessee Court of Criminal Appeals" [*Id.*].  Respondent argues that because Petitioner did not give the Court of Criminal Appeals the opportunity to consider the claim, he has not exhausted it [*Id.*].  As a result, Respondent argues that it is not barred from presentation to the state courts by the statute of limitations under Tenn. Code Ann. § 40-30-102(a) and the "one petition" limitation of § 40-30-102(c), and it is procedurally defaulted in this proceeding [*Id.*].

16

The Court finds that Petitioner did not raise his violation of the privilege against self-incrimination claim to the TCCA on direct appeal. A state prisoner must exhaust all constitutional claims by fully and fairly presenting them in state court before a federal court can consider them in a habeas proceeding. 28 U.S.C. § 2254(b)(1)(A), (C). Petitioner's failure to present his violation of the privilege against self-incrimination claim to the highest Tennessee court has resulted in a procedural default of the claim. *See Stanford*, 266 F.3d at 451.

Additionally, the Court finds that even without the procedural default, it is precluded from understanding and addressing the merits of this claim due to the lack of specific pleadings addressing the issue. Petitioner has not alleged any grounds upon which the Court can find cause or prejudice to excuse this procedural default.

Accordingly, Petitioner's claim that his conviction was based on a violation of the privilege against self-incrimination will be **DISMISSED** as procedurally barred from habeas review.

## d.    Unconstitutionally Selected and Impaneled Jury

Petitioner asserts that his conviction was based on the action of a grand jury or petit jury that was unconstitutionally selected and impaneled [Doc. 1 p. 9].

Respondent argues that "this freestanding claim should be dismissed because it is procedurally defaulted and barred from review." [Doc. 7 p. 36]. Petitioner did not raise the claim on direct appeal [Doc. 6–20]. As with his previous arguments, Respondent states that "while [Petitioner] did raise [this allegation] in his initial petition for post-conviction relief, he did not present it on post-conviction appeal to the Tennessee Court of Criminal Appeals." [Doc. 7 p. 36]. Respondent argues that this claim in barred from presentation to the state courts by the statute of

limitations under Tenn. Code Ann. § 40-30-102(a) and the "one petition" limitation of § 40-30-102(c) [*Id.*].

Although the Court notes that this issue was raised in Petitioner's post-conviction appeal in the context of an ineffective assistance of trial counsel claim, the Court finds that Petitioner did not raise this specific allegation as an isolated claim. Because Petitioner did not give the TCCA the opportunity to consider this claim separately, he has not exhausted it. Accordingly, because Petitioner did not plead any cause to excuse the default of this claim, it is barred from review and subject to dismissal. *Wogenstahl*, 668 F.3d at 321. The Court finds that Petitioner's claim regarding the alleged unconstitutional selection and impaneled jury will be **DISMISSED** as procedurally barred from habeas review.

### e. Illegal Evidence

Petitioner asserts that his conviction was based on illegal evidence [Doc. 1 p. 12].

Respondent argues that Petitioner does not brief this claim or otherwise elaborate, he does not specify what evidence he is referring to, and he does not specify in what way it was illegal [Doc. 7 p. 51]. Respondent argues that based on the lack of information provided he is precluded from understanding and addressing the merits of this claim [*Id.*]. Moreover, Respondent argues that this claim is procedurally defaulted because Petitioner did not raise this claim on direct appeal, although he did raise it in his initial petition for post-conviction relief [Doc. 7 p. 52]. Respondent argues that because Petitioner did not give the Court of Criminal Appeals the opportunity to consider the claim, he has not exhausted it [*Id.*]. As a result, Respondent argues that it is barred from presentation to the state courts by the statute of limitations under Tenn. Code Ann. § 40-30-102(a) and the "one petition" limitation of § 40-30-102(c), and is procedurally defaulted in this proceeding [*Id.*].

18

The Court finds that based on Respondent's reasoning, Petitioner's claim regarding illegal evidence will be **DISMISSED** as procedurally barred from habeas review due to insufficient pleading.

### B. Ineffective Assistance of Counsel

Petitioner asserts that he received ineffective assistance of counsel from his trial attorney with respect to counsel's (1) failure to understand or make an effort to learn the law of joinder; (2) failure to object when co-defendant pled guilty before the very jury panel which was about to try Petitioner; (3) failure to obtain exculpatory evidence and not request the standard jury instructions; and (4) misadvising Petitioner to sign a sentencing waiver [Doc. 2 p. 2-3]. Respondent argues in opposition that "the state court's rejection of Petitioner's ineffective-assistance-of-trial-counsel claims was not contrary to or an unreasonable application of *Strickland* or based on an unreasonable determination of fact in light of the evidence before the state court" [Doc. 7 p. 37].

### 1. Applicable Law

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. Amend. IV. A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive

the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a break down in the adversary process that renders the result unreliable.

*Id.* As with any other claim under § 2254, the burden of proving ineffective assistance of counsel is on the movant. *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of the test set forth in *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). There is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

Second, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Moss v. United States,* 323 F.3d 445, 454 (6th Cir. 2003) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 454-55 (quoting *Strickland,* 466 U.S. at 694). A petitioner must demonstrate that, due to counsel's deficient performance, there was a "breakdown in the adversary process that rendered the result of the proceeding unreliable." *Id*. (quoting *Bell v. Cone*, 535 U.S. 685 (2002)). Counsel is constitutionally ineffective only if a performance below professional standards caused the

defendant to lose what he "otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).

### 2. Analysis

When Petitioner's claims of ineffective assistance were presented to the TCCA, the state appellate court cited to *Strickland* and employed its two-pronged test in reviewing Petitioner's claims of ineffective assistance. Thus, its conclusion relative to those claims is not contrary to the well-established legal rule in Supreme Court cases governing these types of claims. The question then becomes whether the state court's application of *Strickland* to the facts of Petitioner's case was unreasonable.

Each of counsel's alleged failings will be addressed individually.

### a. Failure to Understand or Make an Effort to Learn the Law of Joinder

As his first example of ineffective assistance, Petitioner asserts that his trial counsel failed to understand the law of joinder, which resulted in the trial court improperly joining his and Draughn's cases [Doc. 2 p. 2]. Although Petitioner was ultimately tried alone, he contended that he was prejudiced by counsel's deficient performance because Draughn announced in front of potential jurors that she would not proceed to trial. The TCCA rejected this allegation and found that Petitioner failed to meet his burden of establishing that he was prejudiced by trial counsel's actions. *Owens*, 2014 WL 1759099, at *6-7.

The Court finds that the state court's decision was not contrary to, and did not involve, an unreasonable application of *Strickland*, and it was not based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings. The Court agrees that "it was not unreasonable for the Court of Criminal Appeals to conclude that Petitioner was not

prejudiced by trial counsel's argument against a theory of joinder that was not alleged, when the trial court was able to hear trial counsel and two other attorneys make additional arguments that sufficiently addressed the theory of joinder that was alleged" [Doc. 7 p. 41]. Accordingly, this sub-claim should be **DISMISSED**.

> **b.** **Failure to Object When Co-defendant Pled Guilty Before the Very Jury Panel That was About to Try Petitioner**

Petitioner also claims that defense counsel should have objected when Draughn announced in front of the jury that she would be entering a plea of guilty [Doc. 2 p. 2]. The TCCA rejected this allegation and found that Petitioner had failed to meet either the deficiency or prejudice prong of *Strickland*. *Owens*, 2014 WL 1759099, at *7.

The Court finds that the state court's decision was not contrary to and did not involve an unreasonable application of *Strickland*, and it was not based on an unreasonable determination of the facts in light of the evidence presented in state-court proceedings. As stated by the Court of Criminal Appeals, "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." *Taylor v. State*, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). Counsel's decision not to object could be attributed to trial strategy. As outlined in Respondent's response, "Petitioner has not pointed to any evidence that the strategy was based on inadequate preparation or otherwise met his burden of rebutting the presumption that trial counsel's strategy was sound" [Doc. 7 p. 42]. In fact, the trial counsel testified that he thought the jury's hearing about the plea could be beneficial to show that other people tried to hide the victim's condition from him. *Owens*, 2014 WL 1759099, at *5. On appeal, the TCCA is not able to second guess the tactical or strategic choices of counsel unless

those choices were based upon inadequate preparation, nor may the TCCA measure counsel behavior by "20-20 hindsight." *See State v. Hellard*, 629 S.W.2d 4, 9 (Tenn. 1982). Additionally, the Court finds that Petitioner failed to provide evidence showing any prejudice resulted from Draughn's announcement of a guilty plea. Accordingly, this sub-claim should be **DISMISSED**.

### c. Failure to Obtain Exculpatory Evidence and Not Request the Standard Jury Instructions

Next, Petitioner contends that he received ineffective assistance of counsel because trial counsel failed to request a missing evidence jury instruction for the lost DCS tapes [Doc. 2 p. 3]. Petitioner additionally argues that the TCCA unreasonably applied *Arizona v. Youngblood*, 488 U.S. 51 (1988) [*Id.* p. 2]. The TCCA rejected this allegation and found that Petitioner failed to provide convincing evidence of deficiency and had not met the prejudice prong of *Strickland*. *Owens*, 2014 WL 1759099, at *8-9. The Court concluded that the outcome of Petitioner's trial would not have been different if the jury had been allowed to infer evidence found on those tapes because the State was prosecuting Petitioner under a theory of prosecution that did not depend on any information those tapes provide. *Id.* Petitioner did not establish that he would have been acquitted if the jury had been allowed to hear those tapes. *Id.* The Court of Criminal Appeals declined to find trial counsel deficient for failing to request a jury instruction that Petitioner did not establish he was entitled to [Doc. 7 p. 46].

The Court finds that the state court's decision was not contrary to and did not involve an unreasonable application of *Strickland*, and it was not based on an unreasonable determination of the facts in light of the evidence presented in state-court proceedings. As for Petitioner's allegation that the TCCA unreasonably applied *Arizona v. Youngblood*, the Court finds that

23

Petitioner provided no analysis to support this claim. Without any information to support his allegation, the Court rejects such assertion. Accordingly, this sub-claim should be **DISMISSED**.

### d. Misadvising Petitioner to Sign a Sentencing Waiver

Petitioner contends that he received ineffective assistance of counsel because trial counsel did not know the holding of *Blakely v. Washington*, 542 U.S. 296 (2004), and therefore, misadvised him to sign a sentencing waiver [Doc. 2 p. 3]. Petitioner argues that the Tennessee courts unreasonably applied the holding of *Blakely* as well as *Cunningham v. California*, 545 U.S. 270 (2000), and *Partin v. Tennessee*, 549 U.S. 1196 (2000) [*Id*.]. Petitioner further argues that trial counsel failed to advise Petitioner regarding his right to waive *ex post facto* protections and be sentenced pursuant to the 2005 amendments to the Tennessee Sentencing Reform Act of 1989 [*Id*.].

The Court of Criminal Appeals found that Petitioner failed to provide convincing evidence of deficiency and had not met the prejudice prong of *Strickland*. *Owens*, 2014 WL 1759099, at *9-10. Based on the record, the Court finds that the state court's decision was not contrary to and did not involve an unreasonable application of *Strickland*, and it was not based on an unreasonable determination of the facts in light of the evidence presented in state-court proceedings. The Court agrees with Respondent's argument that "[f]rom trial counsel's testimony, supported by his argument at the sentencing hearing, the Court of Criminal Appeals was reasonable to conclude that counsel's advice that petitioner sign the ex post facto waiver was based on trial strategy and was not deficient. For this reason alone, this sub-claim should be dismissed." [Doc. 7 p. 50].

As for Petitioner's allegation that the state court unreasonably applied the holding of *Blakely v. Washington*, 542 U.S. 296 (2004), *Cunningham v. California*, 545 U.S. 270 (2000), and *Partin v. Tennessee*, 549 U.S. 1196 (2000), the Court finds that Petitioner provided no analysis to support this claim. Without any information to support his allegation, the Court rejects such assertion. Accordingly, this sub-claim should be **DISMISSED**.

## V.    CONCLUSION

For the reasons stated above, the Court finds that none of Petitioner's claims warrant issuance of a writ; therefore, Petitioner's petition for a writ of habeas corpus [Doc. 1] will be **DENIED** and this case will be **DISMISSED**.

## VI.    CERTIFICATE OF APPEALABILITY

The Court must consider whether to issue a Certificate of Appealability ("COA"), should Petitioner file a notice of appeal.  Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may be issued only where a Petitioner has made a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253(c)(2).  Where a claim has been dismissed on the merits, a substantial showing is made if reasonable jurists could conclude that the issues raised are adequate to deserve further review.  *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  When a claim has been dismissed on procedural grounds, a substantial showing is demonstrated when it is shown that reasonable jurists would debate whether a valid claim has been stated and whether the court's procedural ruling is correct.  *Slack*, 529 U.S. at 484.

After reviewing each of Petitioner's claims, the Court finds that reasonable jurists could not conclude that Petitioner's claims are adequate to deserve further review, nor would reasonable jurists debate the correctness of the Court's procedural ruling.  As such, because

Petitioner has failed to make a substantial showing of the denial of a constitutional right, a COA

will not issue.

**IT IS SO ORDERED.**

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE